# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In Re: | ) | **JUDGE RICHARD L. SPEER** |
| | ) | |
| Wendy Sharp | ) | Case No. 05-3211 |
| | ) | |
| Debtor(s) | ) | (Related Case: 05-32293) |
| | ) | |
| Midwest Comm. Fed. Cr. Union | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Wendy Sharp | ) | |
| | ) | |
| Defendant(s) | ) | |

## DECISION AND ORDER

This cause comes before the Court after a Trial on the Plaintiff's Complaint to Determine Dischargeability, and the Defendant's counterclaim thereto. At the conclusion of the Trial, the Court took the matter under advisement so as to afford the opportunity to fully consider the evidence in light of the arguments presented by the Parties. The Court has now had this opportunity, and finds, for the reasons set forth herein, that the Plaintiff's Complaint has merit, and accordingly, the claim held by the Plaintiff against the Defendant is hereby found to be a nondischargeable debt.

## FACTS

Beginning in 2000, the Defendant/Debtor, Wendy Sharp (hereinafter the "Debtor") became a member of the Midwest Community Federal Credit Union, the Plaintiff/Creditor in this action

**Midwest Comm. Fed. Cr. Union v. Wendy Sharp**
**Case No. 05-3211**

(hereinafter the "Creditor"). During the course of their relationship, the Debtor made to the Creditor multiple requests for the extension of credit, with at least two of these requests being unsuccessful. First, in 2003, the Debtor was denied, on an unsecured basis, a loan request of $3,107.85; then in 2004, the Debtor was again denied a loan request of $32,500.00 for the purchase of real property. The basis for both of these denials of credit: the Debtor's other obligations were too excessive. (Pl. Ex. I & J).

In March of 2005, the Debtor again sought an extension of credit from the Creditor for the purchase of a second automobile. In applying for the credit, the Debtor completed an 'indirect loan application' at the dealership selling the vehicle, which was then forwarded to the Creditor. (Pl. Ex. A). This loan application, which contained details concerning the sources of the Debtor's income, was largely consistent with her past two loan requests which had been denied. For example, in all the loan applications, the Debtor's gross monthly salary was listed at around $3,000.00. However, as it concerned the Debtor's income, there did exist this one notable exception: in the 'indirect loan application' for the vehicle, unlike in the prior two loan applications which had been denied, the Debtor claimed also having a monthly rental income of $1,850.00. At the Trial, the Debtor related that this rental income had yet to be realized, but was included in the loan application at the direction of a salesperson.

After receiving a copy of the Debtor's most recent pay stub, the Creditor promptly approved the loan, finalizing the contractual paperwork with the Debtor on March 4, 2005. (Pl. Ex. G). The amount financed with the Creditor was $19,506.25, which took a security interest in the vehicle. However, just one week later, on March 11, the Debtor sought out the advice of legal counsel regarding the possibility of filing for bankruptcy relief. Six days later, on March 17, the Debtor filed in this Court a petition under Chapter 7 of the United States Bankruptcy Code. In her petition, the $1,850.00 in rental income, as just set forth in the loan application, was not disclosed.

Page 2

After filing for bankruptcy relief, the Debtor made one payment to the Creditor under the terms of the Parties' agreement. Thereafter, the Debtor surrendered her vehicle to the Creditor. By all accounts the Debtor was cooperative in this process. On the vehicle loan, there presently exists a deficiency of $4,755.42, plus accruing interest and costs. The instant action seeks a determination that this obligation was incurred through fraud, and therefore is a nondischargeable debt.

### DISCUSSION

Proceedings, such as this, to determine the dischargeability of a particular debt are deemed core proceedings over which this Court has been conferred with subject matter jurisdiction to enter final orders and judgments. 28 U.S.C. § 157(b)(2)(I); 28 U.S.C. § 1334.

The Creditor's complaint to determine dischargeability is brought pursuant 11 U.S.C. § 523(a)(2) which provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>>
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>>
>>> (B) use of a statement in writing–
>>>
>>>> (i) that is materially false;
>>>>
>>>> (ii) respecting the debtor's or an insider's financial condition;

Page 3

> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> > (iv) that the debtor caused to be made or published with intent to deceive[.]

This provision implements the long-standing bankruptcy policy that only those debts which are honestly incurred are entitled to the benefits of a bankruptcy discharge. *Mack v. Mills (In re Mills)*, 345 B.R. 598, 603 (Bankr. N.D.Ohio 2006). Against the Creditor's action under § 523(a)(2), the Debtor filed a counterclaim pursuant to paragraph (d) of § 523, which requires the court to award costs, including attorney fees, in favor of the debtor if it is found that the position of the creditor was not "substantially justified."

As set forth above, the statutory structure of § 523(a)(2) makes a distinction between two types of fraudulent acts: those in writing "respecting the debtor's or an insider's financial condition," and all other types of fraud. Subparagraph (B) of § 523(a)(2) governs statements regarding the debtor's financial condition; while subparagraph (A), by explicitly excluding a statement of that type, operates congruously to encompass, by default, all other types of fraud. *First Safety Fund Nat'l Bank v. Valley (In re Valley)*, 21 B.R. 674, 678 (Bankr. D.Mass.1982). At issue in this matter is subparagraph (B): a written statement respecting the Debtor's financial condition.

At the Trial held in this matter, the Creditor's case-in-chief centered on the Debtor falsely setting forth in her written loan application that she received a monthly rental income of $1,850.00. For purposes of § 523(a)(2)(B), a written statement respecting a debtor's financial condition may be described as one representing the debtor's net worth, overall financial health, or ability to generate income so as to enable an accurate assessment to be made of the debtor's creditworthiness. *In re Joelson*, 427 F.3d 700 (10th Cir. 2005). Although not all loan applications will qualify, the Debtor's

Page 4

fits squarely within this description; it contained detailed information concerning the sources of the Debtor's income, thereby enabling an assessment of her creditworthiness.

Once § 523(a)(2)(B) is shown to be applicable – that the alleged fraud arose as the result of a written statement respecting the debtor's financial condition – a finding of nondischargeability hinges on the applicability of these three additional elements: (1) the existence of a materially false statement; (2) the creditor's reasonable reliance on the false statement; and (3) the debtor's intent to deceive by making the statement. *Thorp Credit, Inc. v. Carmen (In re Carmen)*, 723 F.2d 16, 16-17 (6th Cir.1983). On the applicability of these three elements, the Creditor in this matter, as the movant, bears the burden to establish their existence by at least a preponderance of the evidence. *See, e.g., In re McFarland*, 84 F.3d 943, 946 (7th Cir.1996).

The first element, a materially false statement, has been described as one that paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit. *Blue Ridge Bank and Trust v. Cascio (In re Cascio)*, 318 B.R. 567, 573 (Bankr. D.Kan. 2004); *First Federal Sav. And Loan Assc. v. Kelley (In re Kelley)*, 163 B.R. 27, 35 (Bankr. E.D.N.Y. 1993). At the Trial, the Debtor acknowledged that, at the time she completed her loan application, the $1,850.00 in monthly rental income she listed in the application was inaccurate, having yet to commence and, in fact, never commencing. This inaccuracy constitutes well over 50% of the $3,000.00 the Debtor disclosed as her monthly salary, otherwise her primary source of income.[1]

In looking to whether a statement is substantially inaccurate, the size of the discrepancy is a key factor, and becomes a dispositive consideration in this matter given the breadth of the

---

[1]

The Debtor's loan application also disclosed that she received $56.66 per week for child-support.

Page 5

inaccurate statement provided by the Debtor. *Enterprise National Bank of Atlanta v. Jones (In re Jones)*, 197 B.R. 949, 960 (Bankr. M.D.Ga.1996) ("Materiality is determined in part by the size of the discrepancy."). There is also no arguable doubt that the Debtor's misstatement was a deciding factor in the Creditor's decision to extend credit. Not only did a representative of the Creditor testify to that effect, the objective facts presented to the Court at the Trial bear this out; the Creditor had denied the Debtor credit on the past two occasions when the rental income was not listed.

However, while the Creditor's utilization of the materially false statement evidences actual reliance thereon, § 523(a)(2)(B)(iii), setting forth the second element *supra*, then goes a step further. Not only must the creditor actually rely on the false statement, but such reliance must be reasonable. This is in contrast to the level of reliance required under subparagraph (A) which adopts the lower, common-law standard of justifiable reliance. *See, e.g., Redmond v. Finch (In re Finch)*, 289 B.R. 638, 644 fn.4 (Bankr. S.D.Ohio 2003). The pertinent question in this regard is objective: did the creditor exercise the degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances? *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3rd Cir.1995); *Signal Finance of Ohio v. Icsman (In re Icsman)*, 64 B.R. 58, 62 (Bankr. N.D.Ohio 1986).

To this question, the Debtor, while strenuously denying that she actually intended to mislead, argued that the Creditor's failure to verify the veracity of her rental income, despite the importance it admittedly attached to its existence, demonstrates that the Creditor failed to exercise the necessary degree of care for § 523(a)(2)(B)(iii)'s requirement of reasonable reliance. Against this, the Creditor called this Court's attention to the measures it took to establish the Debtor's creditworthiness – for example, obtaining an updated copy of the Debtor's credit report and requiring the Debtor to produce a recent pay stub so as to corroborate her representation in the credit application regarding her salary. The Creditor also pointed to the relationship of trust which had been established between the Parties during the years they did business together.

Page 6

On the point made by the Debtor, whether a creditor makes an independent inquiry to verify the veracity of a statement upon which it relies to extend credit, while undoubtably important, is not dispositive on the issue of the reasonableness of a creditor's reliance. *Bank of Washington v. Hunter (In re Hunter)*, 120 B.R. 117, 119 (Bankr. E.D.Mo. 1990). Instead, in this Circuit, the question of reasonable reliance is to be answered by "considering all the facts and circumstances of the case, including the size of the loan." *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166-67 (6th Cir.1985). Other relevant considerations in this respect, and ones which align themselves with the points made by the Creditor, may include: (1) whether the creditor followed its established lending procedure in approving the loan; (2) whether the creditor used outside sources to verify the financial information provided by the debtor, such as by obtaining a credit report; (3) whether the creditor had a previous relationship with the debtor; and (4) whether the writing contained any "red flags" that would have alerted the creditor of potential inaccuracies in the financial information provided. *Id.*; *Agribank, FCB v. Gordon (In re Gordon)*, 277 B.R. 805, 810 (Bankr. M.D.Ga. 2001).

When these precautions are then combined with the nature and the character of the Parties' transaction, things conclusively bend in the Creditor's favor; at issue in this matter is a simple consumer loan involving a purchase money security interest. Furthermore, the measures taken by the Creditor, such as running a credit check and obtaining a copy of the Debtor's pay stub, appear entirely reasonable in light of the two competing principles underlying the reasonable reliance requirement of § 523(a)(2)(B)(iii). The general policy that courts should exercise caution when second guessing the business judgment of a creditor in making loans and setting loan policy, versus the concern that creditors should not be able to shield themselves from the negative consequences that flow from facts that were readily ascertainable. *Id.*

The final element in controversy, contained in clause (iv) of § 523(a)(2)(B), is whether the Debtor caused to be made or published the false statement in writing with the intent to deceive. The level of intent required here is that of actual fraud, which means that the debtor, by some direct and

Page 7

active operation of the mind, undertook to deceive; this is opposed to constructive fraud which arises by operation of law irrespective of intent, *Accord United States v. Hercules, Inc.*, 929 F.Supp. 1418, 1426 (D.Utah 1996). Human nature, however, being what it is, actual intent is only rarely ascertainable by direct evidence as a debtor is unlikely to ever admit acting in a fraudulent manner. Consequently, like with other matters where the debtor's state of mind is placed at issue, the use of circumstantial is usually necessary to determine whether the debtor acted with the requisite intent to deceive. *See, e.g., Pittsburgh Police Fed. Cr. Union v. Lundy (In re Lundy)*, 165 B.R. 157, 163 (W.Pa.1994).

In assessing circumstantial evidence of intent, courts have traditionally relied upon certain indicia, commonly called "badges of fraud." *Barthlow v. More (In re More)*, 138 B.R. 102, 105 (Bankr. M.D.Fla.1992). One such indicium unique to § 523(a)(2)(B) occurs when, as has already been established here, the existence of the other elements of the statute are shown.[2] Even this aside, a traditional indicium of fraud, and one whose existence looms large in this case, is the general chronology of the events and transactions under inquiry. *See, e.g., Id.*

In an action brought under § 523(a)(2), a focus of the general chronology of events will often involve measuring the length of time between these two events: the petition date and the date of the transaction in question. The longer the lapse of time between these two events, the less likely an

---

[2] Some courts have held that proof of the other elements under § 523(a)(2)(B) creates a presumption that the debtor made the statement with intent to deceive. Other courts have held that a court may infer fraudulent intent where the debtor knew or should have known of the falsity of his statement. *FG Leasing Co. v. Vavra (In re Harms)*, 53 B.R. 134, 141 (Bankr. D.Minn.1985) (discussing the different approaches). Yet, regardless of how it is posited, the fact that a debtor causes a materially false statement to be published may be used as an indicator that the debtor intended to defraud. Making a statement in writing necessarily involves a reflective mental process which would, as compared to fraudulent conduct in general, make it less likely that the material misstatement was simply the result of a mistake or inadvertence.

Page 8

inference of fraud will arise, with the converse also being true; the shorter the lapse of time, the more likely it will be that an inference of fraud will exist. *Rust v. Tellam (In re Tellam)*, 323 B.R. 661, 665 (Bankr. N.D.Ohio 2005); *Autotruck Fed. Cr. Union v. Donald (In re Donald)*, 26 B.R. 521 (Bankr. W.D.Ky. 1983). *See also* 11 U.S.C. § 523(a)(2)(c) (establishing a presumption of fraud for certain types of transactions conducted in the time immediately preceding the petition date). Significantly, with respect to this measurement, it may be presumed that fraud exists – that is, a *prima facie* case for fraud will arise  – when the interval of time between the transaction and the petition date are so close in proximity that the distinction between the two events becomes blurred, thereby causing them to appear to be apart of the same transaction. *Accord In re Donald*, 26 B.R. 521, 523 (Bankr.W.D.Ky. 1983).

In this matter, such a presumption necessarily arises, with not even two weeks separating the time between when the Debtor received the loan with the Creditor and the time in which she sought to escape her liability on the obligation by filing for bankruptcy. It is difficult to fathom a shorter duration of time. Yet, this window of time becomes shortened even further when it is considered that just one week after obtaining the loan, the Debtor first contemplated discharging the obligation through bankruptcy, this being demonstrated by the Debtor's consultation with a bankruptcy attorney at that time. *See In re Tellam*, 323 B.R. at 665 (pointing out that a fraud's proximity to the petition date will frequently take into account the time at which the debtor first sought out the advice of legal counsel). The indicia of fraud that exists in this case are also not confined solely to the chronology of events.

Another strong indicium of fraud, and one also prominent in this matter, is motive. *C & H Electrical v. Newell (In re Newell)*, 321 B.R. 885, 890-91 (Bankr. N.D.Ohio 2005). On her two most recent transactions with the Creditor, when no rental income was shown, the Debtor had been denied credit based upon a lack of sufficient income to service her present debt obligations. The Debtor,

Page 9

therefore, had to be fully cognizant of the fact that, without the inclusion of the rental income in her credit application, she would have most likely been again denied an extension of credit.

Just as troubling, the Debtor, just after claiming the rental income in her credit application, failed to disclose it in her bankruptcy schedules. *In re Bailey*, 145 B.R. 919, (Bankr. N.D. Ill. 1992) (marked differences in figures placed in financial statement and bankruptcy petition may raise an inference of fraud where they are completed in relative proximity to the other) While the Debtor ascribed this to a misunderstanding, believing that only 'earned income' not 'unearned income' needed to be disclosed in a bankruptcy petition, this is a distinction without a difference. Bankruptcy schedule I, entitled "Current Income of Individual Debtor(s)" specifically requires in line eight that the debtor disclose any income received from real property. Moreover, if the Debtor was in doubt about her statutory obligations, honesty is demonstrated through disclosure, not by making a unilateral assumption that information may be hidden. As this Court has previously observed: when in doubt, disclose. *In re McVay*, 345 B.R. 846, 850 (Bankr. N.D.Ohio 2006); *United States Trustee v. Halishak (In re Halishak)*, 337 B.R. 620, 630 (Bankr. N.D.Ohio 2005).

To explain the existence of these highly persuasive indicia of fraud, the Debtor relied primarily on the existence of an intervening event: that immediately after completing her credit application, her lessee, upon whom she based her rental income, unexpectedly decided not to rent her property. This explanation, however, lacks in credibility. In the short term, at least, other options besides bankruptcy must have been available; for example, there is no evidence that the Debtor, before filing bankruptcy, made any attempt to re-rent her rental property. In this way, bankruptcy has always been a measure of last resort. *Matter of Smith*, 848 F.2d 813 (7th Cir.1988). The Debtor's justification also does not mesh with those facts and circumstances normally associated with an immediate need to seek bankruptcy relief, a prime example being the imminent foreclosure or repossession of one's property.

Page 10

But even if the Debtor's explanation is taken at face value, it simply leads to another quandary. As applied to § 523(a)(2)(B), a finding that a debtor had the specific intent to deceive is not absolutely necessary to sustain a finding of fraud. Instead, in *In re Martin*, the Sixth Circuit Court of Appeals held that a § 523(a)(2)(B) cause of action may be sustained by showing that "the debtor either intended to deceive . . . *or acted with gross recklessness* . . . ." 761 F.2d at 1167 (emphasis added). While the term gross recklessness is an enigmatic term, the Debtor's cavalier attitude toward the Creditor surely qualifies – with the Debtor having financed a nonessential second car, relying on income not received, but which, according to her, was needed to stave off an immediate bankruptcy.

To be sure, there do exist a couple of overall mitigating factors. First, there is no dispute that the Debtor was cooperative with Creditor after filing for bankruptcy, even going so far as to make one payment on her obligation. Additionally, the Debtor, as she contends, may have very well been directed by a salesperson to list the rental income.

However, these points are of insufficient weight to tip the balance in the Debtor's favor. Insofar as it concerns her cooperation, such conduct is expected when a debtor seeks bankruptcy relief. *United States Trustee v. Halishak (In re Halishak)*, 337 B.R. 620, 624 (Bankr. N.D.Ohio 2005). *See also* 11 U.S.C. § 521(a)(3); FED.R.BANK.P 4002. Thus, it would be improper to ascribe much weight for the Debtor simply complying with her statutory duty. Moreover, it is apparent that the Debtor possesses a reasonable degree of financial acumen, – for example, working in the human resources department at a county hospital. Thus, even if directed by a salesperson to list her rental income in the credit application, the Debtor was still, in the end, fully responsible for her statements. *Smith v. Cunningham (In re Cunningham)*, 163 B.R. 657, 660-61 (Bankr. D.Mass.1994).

In summation, the Court finds that the Creditor has sustained its burden with respect to the statutory requirements of § 523(a)(2)(B). Resultantly, the claim held by the Creditor against the Debtor is, for purposes of bankruptcy law, a nondischargeable debt. Additionally, based upon this

Page 11

holding, the Debtor's counterclaim against the Creditor under § 523(d) must be dismissed as a matter of law. *Household Bank, N.A. v. Sales (In re Sales)*, 228 B.R. 748, 752 (10th Cir. B.A.P. 1999) (consumer debt must be discharged to bring action under § 523(d)).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Decision.

Accordingly, it is

***ORDERED*** that, pursuant to 11 U.S.C. § 523(a)(2)(B), the deficiency claim held by the Plaintiff/Creditor, Midwest Community Federal Credit Union, be, and is hereby, determined to be a NONDISCHARGEABLE DEBT.

***IT IS FURTHER ORDERED*** that the counterclaim of the Defendant/Debtor, Wendy Sharp, be, and is hereby, DISMISSED.

Dated: January 4, 2007

_____
Richard L. Speer
United States
Bankruptcy Judge

Page 12

# CERTIFICATE OF SERVICE

Copies were mailed this 4th day of January, 2007 to:

Midwest Community Federal Credit Union
P.O. Box 608
08770 St. Rt. 66
Defiance, OH 43512

Amy C. Rosebrook
Hanna, Fisher & Rosebrook
822 Oakwood Ave
Napoleon, OH 43545

Wendy Lynn Sharp
7243 Rd 177
Oakwood, OH 45873

Randy Lee Reeves
973 W North St
Lima, OH 45805


_____/s/Jennifer S Huff_____
Deputy Clerk, U.S. Bankruptcy Court